# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

─────────────────────────────────────────────────────────────

United States of America,                    Crim. No. 08-390 (ADM/SRN)

         Plaintiff,

v.                                            **REPORT AND RECOMMENDATION**

Herbert Ray Kelly,

         Defendant.

─────────────────────────────────────────────────────────────

Erika Mozangue, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America.

Lyonel Norris, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, and Eric Hawkins, Hawkins Law Office, PA, 3033 Excelsior Blvd., Suite 550, Minneapolis, Minnesota 55415, for Defendant.

─────────────────────────────────────────────────────────────

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant's Motion to Suppress Statements, Admissions and Answers [Doc. No. 17]; Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 18]; and Motion to Suppress Evidence [Doc. No. 20].[1] This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.[2]

---

[1]  At the suppression hearing on these motions, Defendant orally withdrew his Motion to Suppress Eyewitness Identifications [Doc. No. 19].

1

## I.  BACKGROUND

The Government filed an Indictment against Defendant Herbert Ray Kelly on December 16, 2008, charging him with one count of bank robbery.  [Doc. No. 9].  The Indictment alleges Kelly robbed the TCF Bank located at 1444 Lake Street, Minneapolis, Minnesota on or about November 12, 2008.

This Court held a pre-trial motions hearing on March 30, 2009.  Minneapolis Police Officers Bevan Blauert, Steven Manhood, and Christopher Cushenbery testified at the hearing on behalf of the Government.  The Court did not receive any exhibits into evidence.  This matter is set for trial before United States District Judge Ann D. Montgomery on April 20, 2009.

## II.  FACTS

On November 12, 2008, at or about 10:30 a.m., Officers Blauert, Manhood, and Cushenbery[3] received information through dispatch about an armed bank robbery at the TCF Bank located at 1444 Lake Street, Minneapolis, Minnesota.  (Testimony of Officers Bevan Blauert, Steven Manhood, and Christopher Cushenbery on March 30, 2009).  The initial information provided by dispatch was that the robbery suspect was a lone black male who left the bank premises on foot.  (Manhood Test.).  Dispatch then aired a description of the suspect as a light-complexioned black male, with a pock-marked face, in his 30s or 40s, and wearing a brown coat.  (Blauert Test.).  As the officers were in the process of responding to the call, dispatch provided information that the robbery suspect had boarded Metro Transit Bus 17W. (Manhood, Blauert and Cushenbery Test.).  Dispatch also informed the officers that the money

---

[2] The Court has addressed Defendant's non-dispositive motions in a separate Order.
[3] As of the date of the robbery, Officer Blauert had 18 years of experience in law enforcement and Officer Manhood had 12 years of experience.  Officer Cushenbery completed the

taken in the robbery included a GPS tracking device and the GPS signal showed the money from the robbery was located near the corner of West Lake Street and Hennepin Avenue.  (Manhood Test.).

After receiving this information, Officers Blauert and Manhood went to the area of West Lake Street and Hennepin Avenue and arrived approximately two to three minutes after the original dispatch.  (Blauert and Manhood Test.).  Officer Blauert looked for buses and located the 17W bus at approximately West 28th Street and Hennepin Avenue, two and a half blocks from the subject bank.  (Blauert Test.).  He then told dispatch that he had located the bus and was awaiting back-up.  (Id.).  Officer Manhood arrived in the area at or around the same time as Officer Blauert.  (Blauert and Manhood Test.).  He saw two buses in the general area of West 28th Street and Hennepin Avenue, and entered the first bus.  (Manhood Test.).  Officer Manhood asked the bus driver if he was on the 17 bus and the driver replied that the 17 bus was behind him.  (Id.).  At the time Officers Blauert and Manhood arrived at the scene, the 17W bus was already stopped.  (Blauert and Manhood Test.).  Both officers were wearing their uniforms at the time they arrived on the scene, both were armed, and they arrived on scene in marked squad cars with their lights activated.  (Id.).

Officer Manhood entered the 17W bus just before Officer Blauert, and the officers boarded the bus with their guns drawn and pointed in the general direction of the rear area of the bus.  (Blauert and Manhood Test.).  The officers testified that they had their weapons drawn because the crime involved a felony and dispatch reported the suspect was armed or that the robbery involved a gun.  (Id.).  There were approximately 10 individuals on the bus, two of

police academy on November 6, 2008 and became a certified police officer on November 7, 2008.

whom were black males. (Id.).  The first black male was seated approximately in the back three-fourths of the bus, and the second black male was located in the last row of the bus. (Id.).  The officers ordered the two black males to stand and put their hands up, and both men complied. (Id.).  At the hearing, Officers Manhood and Blauert confirmed that the two men were not allowed to leave the bus and would not have been allowed to access any items in their pockets. (Id.).

The officers then approached the two men and when the officers reached the location of the first male, Officer Blauert indicated that he would handle the first male and Officer Manhood should proceed to the male in the last row.  (Id.).  At the hearing, the officers identified Defendant Kelly as the first black male they encountered on the bus.  (Id.).  Both officers testified that Kelly appeared extremely nervous, and Officer Manhood stated Kelly was "shaking like a leaf."  (Id.).

Officer Blauert confronted Kelly and told him the officers were conducting an investigation.  (Blauert Test.).  At the hearing, Blauert could not recall if he said specifically it was an investigation of a bank robbery or if he did not specify what type of crime he was investigating.  (Id.).  Officer Blauert noted that Kelly appeared to "somewhat" fit the description of the suspect given by dispatch in that Kelly was the correct age, race, and complexion, but he did not have a pock-marked face.  (Id.).  Additionally, Kelly was wearing a black, rather than brown, jacket.  (Id.).  In his police report, Officer Blauert wrote that Kelly "was slightly older than the given description."  (Id.).

While on the bus, Officer Blauert asked Kelly if he had a gun and Kelly replied no to this question.  (Id.).  In the area where Kelly had previously been seated, Officer Blauert observed a

bag.  (Id.).  Officer Blauert then asked Kelly if the bag belonged to him, but Kelly did not respond or answer the officer.  (Id.).  Kelly was not handcuffed at this time.  (Id.).  Next, Officer Blauert conducted a pat down search of Kelly's person but did not locate any weapons.  (Id.).  After the pat down search, Officer Blauert took one or two steps in the direction of the bag he observed near Kelly's seat.  (Id.).  Before Blauert reached the bag, Kelly spontaneously stated, "I did it."  (Id.).  There is no evidence in the record that Kelly made this statement in response to any questioning by Officer Blauert or any other officer.  After hearing Kelly state "I did it," Officer Blauert immediately turned and handcuffed Kelly and placed him under arrest.  (Id.).

At the same time that Officer Blauert was dealing with Kelly, Officer Manhood confronted the second black male at the back of the bus.  (Manhood Test.).  According to Officer Manhood, the second male was cooperative.  (Id.).  While conducting a pat down search of the second male, Officer Manhood heard Kelly state, "I did it."  (Id.).  Officer Manhood did not hear anything said by Officer Blauert.  (Id.).  Drawing his weapon, Officer Manhood joined Officer Blauert in confining and arresting Kelly.  (Id.).

Officer Blauert testified that he did not look in the bag beneath Kelly's seat. (Blauert Test.).  After Officer Blauert handcuffed Kelly, Officer Manhood looked at the bag, which was partially open, and saw money in the bag.  (Manhood Test.).  Officer Manhood testified that he did not touch the bag and did not move closer or change his position in order to view the contents of the bag.  (Id.).  Officer Blauert later learned from his sergeant that the bag contained money and Kelly's identification.  (Blauert Test.).

The officers then escorted Kelly off the bus and placed him in the rear of a squad car. (Blauert Test.).  While exiting the bus, Kelly repeated his statement "I did it" and asked if it was

a federal crime.  (Id.).  Kelly also suggested to the officers that the reason for the robbery was because someone was holding his family hostage.  (Id.).  Officer Blauert testified that Kelly made the statements voluntarily and not in response to any questioning by the officers.  (Id.).  At the hearing, Defendant agreed that he was not seeking to suppress any statements made after Kelly entered the squad car.

Officer Cushenbery was also at the scene of the bus and subsequent arrest.  (Cushenbery Test.).  He arrived in the area, closed the intersection, and provided cover to the officers on the bus.  (Id.).  Once Officers Blauert and Manhood identified Kelly as the suspect, Officer Cushenbery stepped onto the stairs in the doorway of the bus to assist in the arrest if necessary. (Id.).  When Officer Cushenbery entered the bus, he saw that Kelly was already handcuffed. (Id.).  Because Officer Cushenbery's assistance was not required in the arrest, he exited and stood just outside the door of the bus.  (Id.).  As Officers Blauert and Manhood escorted Kelly off the bus, Officer Cushenbery confirmed that Kelly say "I did it" at or around the time Kelly was on the stairs of the bus.  (Id.).  Officer Cushenbery does not recall hearing Officers Blauert or Manhood question or say anything to Kelly.  (Id.).

## III.    DISCUSSION

Kelly contends that he was unlawfully arrested without probable cause as soon as the officers entered the bus with their guns drawn.  As a result of this allegedly unlawful arrest, Kelly contends this Court should suppress:  (1) any evidence obtained from the bag found on the bus; and (2) Kelly's statements made before he was placed in the squad car.  The Government asserts that Kelly was not arrested until after making the statement "I did it" and when the

officers entered the bus they were engaging in a lawful, investigatory stop.   Likewise, the Government contends the bag was searched incident to Kelly's arrest.

### A.      Nature of Kelly's Police Encounter on the Bus

The Fourth Amendment guarantees "[t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   There are three tiers or categories of citizen encounters with police.   United States v. Poitier, 818 F.2d 679, 682 (8th Cir. 1987), cited in United States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003).   The first level of encounter is a consensual contact involving no coercion or restraint of liberty, and such encounters are outside the scope of the Fourth Amendment.   Id.   A Terry stop, the second level of encounter, is a brief, minimally intrusive seizure.   Id.   These stops are significant enough to invoke the protection of the Fourth Amendment and must be supported by reasonable suspicion.   Id.   Finally, there are highly intrusive, full-scale arrests, which must be based on probable cause.   Id.

Defendant cites to a number of cases which considered whether a reasonable person would have believed he or she was not free to leave because of an officer's display of a weapon. (See Def.'s Memo. in Supp. of Mot. to Suppress Evidence at 5).   However, these cases analyzed the line between a consensual police communication and an investigatory seizure.   There is no suggestion in this case that Kelly's encounter on the bus was consensual.   Rather the issue in this case is whether the officers engaged in an investigatory stop or an arrest.

### 1.      When an Investigatory Stop Becomes an Arrest

There is no bright line of demarcation between investigative stops and arrests.   United States v. Sharpe, 470 U.S. 675, 685-86, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985).   Rather, a

court considers whether the law enforcement officer, "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Id. (citing Michigan v. Summers, 452 U.S. 692, 701 n. 14, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981)).  The determination of whether an arrest has occurred does not depend upon whether the officers announced that they were placing the suspects under arrest.  Dunaway v. New York, 442 U.S. 200, 212, 99 S. Ct. 2248, 2256, 60 L. Ed. 2d 824 (1979).

"An action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop."  United States v. Rose, 731 F.2d 1337, 1342 (8th Cir. 1984) (quoting Florida v. Royer, 460 U.S. 491, 505, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)). An investigative detention may turn into an arrest if it "lasts for an unreasonably long time or if officers use unreasonable force."  United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999); see also United States v. Donnelly, 475 F.3d 946, 953 (8th Cir. 2007).

The use of handcuffs during a Terry stop does not convert the stop into an arrest.  United States v. Summe, No. 05-4179, 2006 WL 1458293 (8th Cir. May 30, 2006); United States v. Saffeels, 982 F.2d 1199, 1206 (8th Cir. 1992) (overruled on other grounds).  The use of handcuffs "can be a reasonable precaution during a Terry stop to protect [officers'] safety and maintain the status quo."  United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006). Likewise, a Terry stop is not converted into an arrest merely because an officer draws or brandishes his or her gun to control the scene.  United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004); see also United States v. Danielson, 728 F.2d 1143, 1146-47 (8th Cir. 1984) (determining officers did not exceed bounds of investigative detention by approaching suspects in armed bank robbery with weapons drawn); United States v. Navarrete-Barron, 192 F.3d 786,

8

789-91 (8th Cir. 1999) (holding officers did not exceed limits of <u>Terry</u> stop by drawing weapons and handcuffing drug trafficking suspect who may have been armed).

This Court concludes that when the officers entered the bus and told Kelly to put his hands up, the officers were engaging in a <u>Terry</u> stop and not an arrest. The stop lasted only a few minutes, during which time the officers reasonably detained Kelly and the other black male. The stop only continued long enough for officers to ask Kelly some basic identifying information and to conduct a pat-down search, after which Kelly made the statement "I did it." The fact the officers had their weapons drawn when boarding the bus does not make the seizure an arrest. Because the length of the stop was minimal and there is no indication the officers used unreasonable force, Kelly's initial detention should be considered a <u>Terry</u> stop.

## 2.      Standard for a Lawful Investigatory Stop

An investigatory detention is a narrow exception to the Fourth Amendment's probable cause requirement. <u>Terry v. Ohio</u>, 392 U.S. 1, 26-27 (1968). In <u>Terry</u>, the Supreme Court held that a police officer may stop and briefly question a person who is reasonably suspected of criminal activity. <u>Id.</u> at 22-24. The officer must have a reasonable, articulable suspicion of criminal activity in order to conduct the investigatory detention. <u>Id.</u> at 21-22. A reasonable, articulable suspicion means that there are specific and articulable facts, and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent. <u>Id.</u> at 21.

Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances. <u>United States v. Maltais</u>, 403 F.3d 550, 554 (8th Cir. 2005). "[T]he

standard employed is less demanding than the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that the information must exhibit." United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002), cited in United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007).  An officer may rely on the information known by a team of officers involved in an investigation to provide justification for a Terry stop.  United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) (citing United States v. Robinson, 119 F.3d 663, 666-67 (8th Cir. 1997)).

During a Terry stop, a law-enforcement officer may conduct a limited, warrantless search for the protection of himself or others nearby, in order to discover weapons.  United States v. Roggeman, 279 F.3d 573, 577-78 (8th Cir. 2002).  An officer may conduct this pat-down search when he or she has a reasonable, articulable suspicion that the person may be armed and presently dangerous.  Id. (citing Terry, 392 U.S. at 30).  A pat-down search must be confined to a search reasonably designed to uncover concealed weapons.  Id. (citing Adams v. Williams, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.")).  Courts are required to apply an objective test to resolve the question of whether a reasonable, articulable suspicion justified a protective search.  Id.  Under this objective standard, the "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. (citing Terry, 392 U.S. at 27).

10

This Court concludes that the officers had a reasonable, articulable suspicion of criminal activity sufficient to support the Terry stop.  Martinez is substantially analogous to the instant case.  Martinez, 462 F.3d at 907.  In that case, officers had information that a robbery had been committed with the use of a gun.  Id.  The defendant "was a close match to the description of the robber," he was located near the scene of the robbery, and he was "acting suspiciously."  Id.  The officers handcuffed the defendant because they had reason to believe that the defendant might be the robber and that he might still have the gun used to commit the crime.  Id.  The Eighth Circuit concluded that the defendant in Martinez was subjected to a Terry stop, not a formal arrest, and that the stop was supported by a reasonable, articulable suspicion.  Id.

As in Martinez, the officers in this case had a reasonable, articulable suspicion to stop the bus and detain Kelly.  The bus was located only a few blocks from the robbed bank and only a few minutes after the robbery had occurred.  A witness indicated the robbery suspect had boarded the 17W bus.  Moreover, GPS signals indicated the stolen money was on the bus.  Once the officers entered the bus, they encountered Kelly who closely, albeit not completely, matched the description of the suspect.  Kelly also acted suspiciously and nervous.  Based on these facts, the Court believes the seizure of Kelly was supported by reasonable, articulable suspicion and did not violate the Fourth Amendment.  Officer Blauert also had a reasonable, articulable suspicion to support the pat-down search for weapons because he had information that the crime was a felony involving a gun and he needed to secure the safety of the other passengers on the bus.

**B.**      **Suppression of Kelly's Statements**

Kelly has also moved to suppress any statements he made before being placed in the squad car. The statements at issue include: (1) Kelly's pre-arrest statement, "I did it," which was not made in response to officer questioning; (2) Kelly's various statements made after his arrest, but not in response to officer questioning, ("I did it," asking if it was a federal crime, and stating the reason for the robbery was his family was being held hostage); and (3) before his arrest, Kelly saying "no" in response to Officer Blauert questioning whether Kelly had a gun.

At the hearing, the Court requested Kelly's counsel to articulate the basis for Kelly's motion to suppress statements. In response, counsel asked for an opportunity to brief the issue in writing. In his post-hearing brief, [Doc. No. 37], Kelly does not articulate the basis for his motion to suppress statements and only made arguments regarding the suppression of evidence seized from the bag on the bus. While Kelly has not set forth any particular grounds for suppression of the statements, the Court has nevertheless reviewed the record and concludes the statements were lawfully obtained. Accordingly, the Court recommends that the motion be denied.

A statement does not need to be suppressed as "fruit of the poisonous tree" under Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), when the initial Terry stop is supported by reasonable, articulable suspicion. Martinez, 462 F.3d at 910. As set forth supra., the seizure of Kelly on the bus was a lawful Terry stop supported by reasonable, articulable suspicion.

### 1. Spontaneous Statements Not Made in Response to Questions by Law Enforcement Officers.

A law enforcement officer must advise a person of his Miranda rights before interrogating a suspect in a custodial setting. Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct.

1602, 16 L. Ed. 2d 694 (1966); <u>Illinois v. Perkins</u>, 496 U.S. 292, 297, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1992).   <u>Miranda</u> defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>United States v. Hogan</u>, 539 F.3d 916, 921 (8th Cir. 2008) (citing <u>Miranda</u>, 384 U.S. at 444).   An interrogation includes either express questioning or words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response.   <u>Id.</u>; <u>United States v. Howard</u>, 532 F.3d 755, 762 (8th Cir. 2008); <u>United States v. Torres-Lona</u>, 491 F.3d 750, 757 (8th Cir. 2007).   "[A] voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of <u>Miranda</u> warnings." <u>United States v. Withorn</u>, 204 F.3d 790, 796 (8th Cir. 2000), <u>quoted in</u> <u>United States v. Aldaco</u>, 477 F.3d 1008, 1016 (8th Cir. 2007); <u>see also</u> <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009).

In this case, Kelly made various spontaneous statements that need not be suppressed without a <u>Miranda</u> warning.   Before his arrest, Kelly voluntarily made the statement, "I did it," and there is no evidence he made this statement in response to a question by law enforcement officers.   Nor is Officer's Blauert's movement towards the bag an action an officer would know is reasonably likely to elicit an incriminating response.   Similarly, Kelly's post arrest statements do not need to be suppressed.   Even if Kelly was in custody after his arrest, his subsequent statements were not made in response to any questions or interrogation by police officers.   These voluntary statements are admissible, despite Kelly not receiving any <u>Miranda</u> warnings, and the statements do not need to be suppressed.

### 2.      Statements in Response to Officer Questioning.

Kelly's answer to Officer Blauert that he did not have a gun likewise does not need to be suppressed.   The Supreme Court has addressed the intersection between a <u>Terry</u> stop and a custodial interrogation:

> The [<u>Terry</u>] stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purpose of Miranda.

<u>Berkemer v. McCarty</u>, 468 U.S. 420, 439-40, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984), <u>cited in</u> <u>United States v. Pelayo-Ruelas</u>, 345 F.3d 589, 592 (8th Cir. 2003); <u>see also</u> <u>United States v.</u> <u>Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995) (holding <u>Miranda</u> warnings are not necessary during ordinary <u>Terry</u> stops because they generally do not amount to custodial interrogation).

During a typical <u>Terry</u> stop, an officer may ask the individual "a moderate number of questions" to determine the person's identity and to confirm or deny the officer's suspicions. <u>United States v. Gilliam</u>, 520 F.3d 844, 847 (8th Cir. 2008); <u>United States v. Rodriguez-Arreola</u>, 270 F.3d 611, 617 (8th Cir. 2001).  Limited questioning of an individual about the possession of a weapon during a <u>Terry</u> stop does not require a <u>Miranda</u> warning.   <u>United States v.</u> <u>Boucher</u>, 909 F.2d 1170, 1174 (8th Cir. 1990) (citing <u>United States v. Harris</u>, 611 F.2d 170, 173 (6th Cir. 1979) (questioning of suspect in his hotel room as to whether he had a weapon did not require Miranda warnings)).

14

The evidence at the hearing compels the conclusion that Kelly was not subjected to custodial interrogation during the <u>Terry</u> stop.  The only question that Kelly answered during the <u>Terry</u> stop was whether he had a gun and the only other question Officer Blauert asked was whether the bag belonged to Kelly.  Officer Blauert was not required to mirandize Kelly to ask the preliminary question about the gun because it was a consistent with the purposes of a <u>Terry</u> stop and Kelly was not in custody at the time.  The motion to suppress Kelly's statements should be denied.

### C.  <u>Probable Cause for Kelly's Subsequent Arrest</u>

Whether an arrest is lawful depends on the existence of probable cause, which means that the facts and circumstances are "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."  <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964).  As with reasonable suspicion, probable cause may be based on the "collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene."  <u>United States v. Twiss</u>, 127 F.3d 771, 774 (8th Cir. 1997).  In establishing probable cause, police officers "enjoy substantial latitude in interpreting and drawing inferences from factual circumstances."  <u>United States v. Horne</u>, 4 F.3d 579, 589 (8th Cir. 1993).  While a bare suspicion of criminal activity is insufficient to establish probable cause, the police need not have enough evidence to justify a conviction before making a warrantless arrest.  <u>Brinegar v. United States</u>, 338 U.S. 160, 175 (1949).

Kelly contends that "Mr. Kelly's arrest was not based on probable cause; it was based on his being a black man on a bus."  (Def.'s Memo. in Supp. of Mot. to Supp. Evidence at 5).

15

Officers Blauert and Manhood based Kelly's arrest on much more than Kelly's race and presence on a bus.  The officers had information that the robbery suspect had gotten onto the 17W bus specifically and that GPS signals showed the money taken in the robbery was on that bus. Witness information provided a description of the robber, which Kelly closely matched.  Kelly acted suspiciously when officers boarded the bus.  Most significantly, Kelly voluntarily told officers "I did it."  At the hearing Kelly's counsel suggested this statement was made "without context" and officers did not know what Kelly was admitting he did.  The Court finds this argument unconvincing.  While it might have been more clear if Kelly had said "I committed the robbery," it was reasonable for the officers to conclude that Kelly was confessing to the crime they were on the bus to investigate.  These overall facts establish probable cause for Kelly's arrest.

**D.     Suppression of Physical Evidence from Search of Bag**

Kelly also moves to suppress any evidence seized from the search of the bag arguing "officers were not permitted to look inside the bag either before or after Mr. Kelly was arrested." (Def.'s Memo. in Supp. of Mot. to Supp. Evidence at 6).  At the suppression hearing, however, counsel for the government released the officer who could have testified regarding the search of the bag done incident to the arrest, because Kelly's counsel had agreed he was not challenging the search incident to the arrest.  It appears from the briefing that Kelly has now abandoned that position.

**1.     Search of Bag Before Kelly's Arrest**

At the hearing, Kelly appeared to contend that the bag was searched before Kelly was arrested because the police report stated that one of the officers "looked" in the bag.  The

16

unrebutted testimony at the hearing was that the officers only looked in the general direction of the bag and Officer Manhood saw money in the bag in plain sight.  There is no evidence in the record to suggest that, before Kelly was arrested, the officers physically touched the bag or examined its contents.  The term "search" implies "some exploratory investigation, or an invasion and quest, a looking for or seeking out."  Wayne R. LaFave, 1 Search & Seizure § 2.1 (4th ed. 2008).  Neither Officer Blauert's movements towards the bag or the officers' mere visual assessment of the bag constitute a search within the meaning of the Fourth Amendment.  Because the bag was not searched prior to Kelly's arrest, the evidence from the bag need not be suppressed.

### 2.        Search of Bag Incident to Kelly's Arrest

This Court has already concluded that Kelly's initial detention and subsequent arrest were lawful, therefore the search of the bag after Kelly's arrest does not need to be suppressed as fruit of the poisonous tree.  Further, any warrantless search of Kelly's bag incident to his arrest is likewise lawful under the Fourth Amendment.

In order to protect officer safety and preserve evidence, a law enforcement officer may conduct a full search of an arrestee and the area within the arrestee's immediate control in a search made incident to the arrest.  United States v. Jones, 479 F.3d 975, 978 (8th Cir. 2007) (citing United States v. Hrasky, 453 F.3d 1099, 1100-01 (8th Cir. 200)); see also Chimel v. California, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969); United States v. Robinson, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973).  The area within an arrestee's immediate control is the area from which he or she might gain possession of a weapon or destructible evidence.  United States v. Lucas, 898 F.2d 606, 609 (8th Cir. 1990).  The Sixth Circuit decided

a case analogous to the instant case in <u>Northrop v. Trippett</u>, 265 F.3d 372 (6th Cir. 2001).  The court held that law enforcement officers lawfully searched a bus passenger's bag incident to the passenger's arrest, even though the arrest occurred after the passenger had walked away from the bus seat and bag.  <u>Id.</u>

Any search of Kelly's bag was incident to his arrest and was excepted from the warrant requirement.  The bag was in the area of Kelly's seat on the bus and therefore was in his area of immediate control.  Because the bag was in Kelly's area of control, officers were justified in searching the bag for weapons or destructible evidence.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Defendant's Motion to Suppress Statements, Admissions and Answers (Doc. No. 17) be **DENIED**;

2.   Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 18) be **DENIED**; and

3.   Defendant's Motion to Suppress Evidence (Doc. No. 20) be **DENIED**.

Dated: April 14, 2009

_s/ Susan Richard Nelson_____
SUSAN RICHARD NELSON
United States Magistrate Judge

18

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by April 20, 2009, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.